**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **J & S CONCEPTS LLC;** | ) | Case No: 3:24-bk-00066 |
| **PARTY FOWL COOL SPRINGS LLC;** | ) | |
| **PARTY FOWL DESTIN LLC;** | ) | Chapter 11, Subchapter V |
| **PARTY FOWL DONELSON LLC;** | ) | Judge Randal S. Mashburn |
| **PARTY FOWL HAMILTON PLACE LLC;** | ) | |
| **PARTY FOWL MURFREESBORO LLC;** | ) | (Jointly Administered)[1] |
| | ) | |
| Debtors. | ) | |

**EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO: (A) OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED SUPER-PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364; (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. § 361; (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c); AND (IV) GRANTING RELATED RELIEF**

The Debtors in the above-captioned jointly administered cases (the "<u>Debtors</u>"), hereby submit this motion for entry of interim and final orders (1) approving postpetition financing, (2) granting liens and providing super-priority administrative expense status pursuant to 11 U.S.C. §§ 364(c) and (d), (3) authorizing use of cash collateral and providing adequate protection pursuant to 11 U.S.C. §§ 361 and 363, (4) setting final hearing, and (5) granting related relief pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). In support of this Motion, the Debtors state as follows:

**COMPLIANCE WITH LOCAL RULE 2081-1**

Pursuant to Local Rule 2081-1(f) and Rule 4001(c)(1)(B), notice is hereby provided that this motion requests the following relief:

---

[1] The Debtors' respective tax identification numbers (last four digits) and case numbers are: J & S Concepts LLC, Tax ID No. 2361, at Case No. 24-0066; Party Fowl Cool Springs LLC, Tax ID No. 0522, at Case No. 24-0067; Party Fowl Destin LLC, Tax ID No. 4062, at Case No. 24-0068; Party Fowl Donelson LLC, Tax ID No. 4323, at Case No. 24-0069; Party Fowl Hamilton Place LLC, Tax ID No. 4514, at Case No. 24-0070; and Party Fowl Murfreesboro LLC, Tax ID No. 8304, at Case No. 24-0071..

1.      *Granting surcharge or "carve-out" rights to professionals or any restrictions (other than court approval) on the surcharge or carve-out rights granted to professionals—for example, a restriction on investigation or pursuit of causes of action against a lender or secured creditor. See* the budget attached hereto at **Exhibit B** (the "**Budget**").  The Budget contains consolidated cash flow projections that include and contemplate payment of professional fees.

2.      *Findings, conclusions, or holdings as to the amount of a debt or the validity, priority, or extent of a lien or security interest that purport to affect the rights of any entity other than the debtor-in-possession and the creditor.*  For the **limited purpose of obtaining the interim relief requested in the Motion**, the Debtors do not dispute the validity or extent of liens in favor of Regions Bank (Party Fowl Murfreesboro and Party Fowl Donelson); Studio Bank (J & S Concepts/Party Fowl Nashville); or ServisFirst Bank (Party Fowl Cool Springs), the U.S. Small Business Administration (Party Fowl Nashville/J & S Concepts), VOX Funding (Party Fowl Nashville/J & S Concepts), UFS Funding (Party Fowl Nashville/J & S Concepts), Rewards Network (Party Fowl Donelson and Party Fowl Murfreesboro), and WebBank d/b/a Toast Capital (Party Fowl Nashville/J & S Concepts and Party Fowl Cool Springs) (collectively purporting to be the "**Secured Creditors**").  The **Debtors reserve the right to challenge the validity or extent of any such liens at or before the final hearing on the Motion and throughout the pendency of the bankruptcy case**.

3.      *The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under §364 to make cash payments on account of the claim.* As adequate protection, Debtors propose to provide the Secured Lenders with replacement liens, in the same priority as existed as of the Petition Date, subject to the priming DIP Facility. Borrowing Debtors further reserve the right to make interim adequate protection payments to the Secured Lenders to adequately protect their interest (if any) in the Borrowing Debtors' collateral.

4.      *Priming of Secured Creditor Pursuant to 11 U.S.C. § 364(d) without Consent.* As set forth herein, the Debtor requests an order granting **Hargett Hunter Capital Management, LLC, or an affiliate,**

**subsidiary, or assignee thereof** (the "DIP Lender") a senior secured first priority lien on all of the Borrowing Debtors' (as that term is herein defined) assets, priming the liens of the Secured Creditors, to the extent any exist. The Debtors have informed Studio Bank, ServisFirst Bank, and Regions Bank of the need for post-petition financing and the likelihood of a priming lien, and no party has objected.

5. *The granting of a lien on any claim or cause of action arising under §§544, 545, 547, 548, 549, 553(b), 723(a), or 724(a)*. The DIP Facility proposes to provide the DIP Lender with a lien on the Borrowing Debtors' bankruptcy causes of action.

### COMPLIANCE WITH LOCAL RULE 9075-1

i.      <u>Expedited Relief Requested</u>.  The Debtors request the Court to authorize the Borrowing Debtors to obtain debtor-in-possession financing (the "<u>DIP Facility</u>") consistent with the terms set forth in **Exhibit A,** as the same may be amended by notice filed by the Debtors from time to time prior to the interim and final hearing hereon.

ii.      <u>Basis for Urgency</u>.  The Borrowing Debtors need to obtain financing in order to pay administrative expenses in this case, and further to fund its operations. In particular, the requested financing must be approved as soon as possible to allow the Borrowing Debtors to (i) meet their upcoming payroll obligations; (ii) meet their upcoming administrative expense tax obligations; (iii) pay post-petition rents; (iv) remain current with vendors; and (v) spend necessary funds on facility maintenance.

iii.      <u>Notice</u>.  This motion has been served on (i) all parties consenting to electronic service via the Court's CM/ECF system, (ii) the Office of the United States Trustee via email, (iii) the 20 largest creditors and all secured creditors via email, fax, or U.S. mail.  This motion has also been emailed to all parties asserting a security interest in the Borrowing Debtors' cash collateral.

iv.      <u>Suggested Hearing Date</u>.  The Debtor requests an interim hearing date of on or before March 12, 2024 at 9:30 a.m., in Courtroom 1, Customs House, 701 Broadway, Nashville, Tennessee 37203, with a final hearing on March 19, 2024, or such other time set by the Court.

v.      <u>Supporting Argument</u>.  The Debtors support this motion as set forth below.

**JURISDICTION**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Sections 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014.

**PRELIMINARY STATEMENT**

3.      On January 9, 2024 (the "Petition Date"), each of the Debtors filed a separate voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy Code. The Debtors are managing their affairs as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee or examiner has been appointed. Tim Stone has been appointed as the Subchapter V trustee in these cases.

4.      The Debtors have filed a *Company Profile*, which includes the history of the Debtors, a summary of the Debtors' operations, and Debtors' reasons for filing Chapter 11 (the "Company Profile") [Doc. No. 7].  The Company Profile in these jointly administered cases is incorporated herein by reference.

5.      The Debtors have, since the commencement of these cases (and prior thereto), sought financing needed to withstand the remainder of the Debtors' slow season; to enable the Debtors to cure monetary defaults under to-be-assumed executory contracts; to enable the Debtors pay tax, PACA, and other trust fund obligations; and to enable the Debtors to remain current on their administrative expense obligations.

6.      The Debtors have been able to locate a lender who is willing to provide the necessary funding on the terms and conditions set forth in **Exhibit A** (as the same may be amended from time to time), but only to J & S Concepts/Party Fowl Nashville, Party Fowl Murfreesboro, Party Fowl Donelson, and Party Fowl Cool Springs (the "Borrowing Debtors").

7.     The Borrowing Debtors had, as of the Petition Date, various parties purporting to assert a blanket lien (or a near blanket lien) on the Borrowing Debtors' assets, described above as the Secured Lenders and set forth again here:

   a.   <u>Party Fowl Nashville</u> (J & S Concepts) – U.S. Small Business Administration (blanket UCC lien – EIDL loan), Studio Bank (blanket UCC lien), VOX Funding (merchant cash advance), UFS Funding (merchant cash advance), and WebBank d/b/a Toast Capital (merchant cash advance);

   b.   <u>Party Fowl Murfreesboro</u> - Regions Bank (blanket UCC lien); Rewards Network (merchant cash advance);

   c.   <u>Party Fowl Donelson</u> – Regions Bank (blanket UCC lien); Rewards Network (merchant cash advance); and

   d.   <u>Party Fowl Cool Springs</u> – ServisFirst Bank (blanket UCC lien); WebBank d/b/a Toast Capital (merchant cash advance).

8.     While each of the Secured Creditors has filed a UCC-1 ostensibly covering the applicable Debtors' assets, the Debtors do not believe that any Secured Creditor is perfected in the Debtors' cash collateral nor do the Debtors believe that any Secured Creditor is entitled to adequate protection.

9.     The Borrowing Debtors intend to finance the above-mentioned post-petition operations through a post-petition revolving credit facility (the "<u>DIP Facility</u>") to be provided by the DIP Lender.

10.    In the absence of the DIP Facility, the Borrowing Debtors are unable to maintain their equipment and facilities, replace broken furniture, fixtures and equipment (FF&E), and remain current on post-petition obligations without running out of cash. The Debtors filed these cases at the nadir of their seasonal operations and have barely been able to survive to date, but are not well situated to take advantage of the upcoming busy season due to deferred expenses, broken FF&E, and the need to cure soon-to-be-assumed executory contracts  The financing requested herein will serve as a float to ensure the Borrowing Debtors have the ability to draw upon a credit line to ensure that these necessary payments will be timely made. It is critical to the Debtor's continued operations that it obtains post-petition financing in the form of

a revolving line with sufficient availability to cover the anticipated expenses in the Budget attached hereto as **Exhibit B**[2].

11.     No Secured Creditor has offered or agreed to provide post-petition financing, despite these cases having been pending for nearly two months and the Debtors' obvious need and expressed desire therefore. The Borrowing Debtors are currently ineligible to borrow from the SBA or any of the merchant cash lenders. The DIP Lender has agreed to provide a revolving line of under the favorable terms and conditions provided herein.

## THE DIP FACILITY

12.     As a result of negotiations, the DIP Lender has preliminarily agreed to provide the Borrowing Debtors with a post-petition DIP Facility in the maximum aggregate amount of $300,000, allocated as $75,000 per borrower, with $15,000 per borrower carved out to cover administrative expenses of the Debtors, to include approved attorney's fees and the Subchapter V Trustee's escrow.

13.     The Borrowing Debtors each believe that the DIP Facility will provide it with sufficient liquidity to operate its assets during the Chapter 11 Case in order to maximize the value of its assets and operations for the benefit of its creditors. In contrast, without the DIP Facility, the Borrowing Debtors will have little available cash, face the likelihood of becoming administratively insolvent (much like Party Fowl Hamilton Place and Party Fowl Destin), be unable to maximize the value of its assets, and be unable to minimize the adverse effects of the commencement of the Chapter 11 Case on its business. Consequently, the Court should approve the DIP Facility and authorize the Borrowing Debtors to enter into documents necessary to document the DIP Facility, on terms consistent with the DIP Facility, and obtain the financing contemplated therein.

---

[2] Debtors reserve the right to amend the Budget at any time prior to the Interim and Final hearings hereon by filing and serving a notice of the same.

## A. **Terms of the DIP Credit Facility**

14. Federal Rule of Bankruptcy Procedure 4001(c)(1)(B) requires a motion for authority to obtain credit to contain a concise statement that summarizes all material provisions of the proposed credit agreement, to include interest rate, maturity, events of default, liens, borrowing limits, and borrowing conditions.

15. The terms of the DIP Facility are more specifically set forth in the Term Sheet attached hereto as **Exhibit A**, as the same may be amended from time to time, and which Term Sheet shall be supplemented by a DIP Credit Agreement prior to the Interim and Final Hearing on this Motion. The key provisions of the DIP Facility are as follows:

| | |
|---|---|
| **DIP Lender**: | An affiliate or subsidiary of Hargett Hunter Capital Management, LLC ("HH"), or any non-affiliated party or parties as designated at the sole discretion of HH prior to the initial funding of the DIP Facility (collectively, the "DIP Lenders"). |
| **DIP Facility:** | A multiple draw secured super senior loan facility (the "DIP Facility") in an aggregate principal amount not to exceed $300,000. Advances to be subject to minimum initial draws of $25,000 per entity and subsequent draws in increments of $10,000. |
| **Use of Proceeds:** | To fund general corporate and ordinary course purposes of the Borrowing Debtors in accordance with the DIP Budget as approved by DIP Lender. Debtor shall be permitted to use cash collateral in accordance with the DIP Budget provisions described in the "Operating Budget" section below. |
| **Maturity:** | Unless extended by written agreement of the Parties, the earlier of: (i) 90 days after initial funding ("Final Maturity Date"), (ii) the date on which a sale of all or substantially all of the assets of the Borrowers is consummated, (iii) the date the DIP Facility is accelerated upon the occurrence and declaration of an Event of Default, (iv) the date that the DIP Facility shall become due and payable in full hereunder or pursuant to the DIP Orders, whether by acceleration or otherwise; or (v) the date that the Borrowers' Chapter 11 Plan becomes effective (each, the "Maturity"). |
| **Interest:** | 15% per annum on the average portion of the DIP Facility outstanding in any given month, compounded monthly. |
| **Effective Date:** | Date of entry of Interim DIP Order. |
| **Additional Terms** | |
| **Security:** | Pursuant to sections 364(c) and (d) of the Bankruptcy Code, all obligations of the Borrower under the DIP Facility ("DIP Obligations") will be secured by security interests in all of the Borrower's and its bankruptcy estate's assets (the "Collateral"), including, subject to the entry of the Final DIP Order, proceeds and rights in respect of avoidance actions under sections |

502(d), 510, 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code ("Avoidance Actions"). Collateral shall include all property that is not subject to a security interest or lien as of the Petition Date and property that is covered by a security interest or lien as of the Petition Date. Such liens on the Collateral will be valid, enforceable, and perfected first-priority priming liens and security interests, with priority over any and all prepetition or post-petition liens, security interests, and other interests including any and all mechanics and materialmen's liens ("M&M Liens") and shall be subject and junior only to (i) the Carve-Out Expenses and (ii) the Budgeted Expenses. The DIP Lender shall also have a super-priority administrative expense under section 364(c)(1) of the Bankruptcy Code against the Borrower for the amount of all obligations under the DIP Facility, subject only to the Carve-Out Expenses and Budgeted Expenses. No person other than the DIP Lender shall have a lien on the collateral, except for (i) the liens existing as of the Petition Date and (ii) M&M Liens (it being understood that pursuant to the DIP Orders any and all such liens will be junior to the DIP Facility).

| | |
|---|---|
| **Events of Default:** | The DIP Facility shall include events of default customary for DIP loan transactions and investments of a similar size and nature. |
| **Remedies on Default:** | The DIP Orders and the DIP Facility loan documentation shall provide that, upon the occurrence and during the continuation of an event of default under the DIP Facility, DIP Lender shall have customary remedies, including, without limitation, the right to (a) declare the principal of and accrued interest on the outstanding DIP Facility to be immediately due and payable, (b) accelerate the DIP Obligations and terminate, as applicable, any further commitment to lend to Debtor, and (c) charge the default rate of interest on the DIP Facility. |
| **Carve-Out** | Carve-Out Expenses shall include approved Professional Fees of the Borrowers' counsel, accountants, and the Subchapter V Trustee in an amount up to $60,000, retroactive to the Petition Date. Carve-Out Expenses will be paid directly by the DIP Lenders and allocated equally to each Borrower. |

**Other Terms**

| | |
|---|---|
| **DIP Orders:** | The DIP Orders shall be in form and substance acceptable to DIP Lender and shall include, without limitation, provisions (a) approving in all respects the definitive documentation evidencing the DIP Facility, and authorizing and directing Debtor to execute and become bound by such definitive documentation, (b) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the DIP Orders and documents evidencing the DIP Facility, including, without limitation, to permit the creation and perfection of the DIP Liens on the DIP Collateral, (c) providing for the automatic relief of such stay to permit the enforcement of DIP Lender's remedies under the DIP Facility, subject to the right of Debtor and/or the Committee to re-impose or continue the automatic stay and (d) permitting Debtor to use cash collateral in accordance with the DIP Budget. |
| **Indemnification:** | Customary for a transaction of this type, as set forth in the DIP Credit Agreement, to include payment by Debtor of all reasonable costs and |

expenses incurred by the DIP Lender in connection with the preparation, execution, delivery, administration, modification and amendment of the loan documents and all actions by the DIP Lender to enforce its rights under the applicable loan documents.

**Governing Law:** Tennessee law, except as governed by the Bankruptcy Code.

## B.      The Necessary Showings Under Section 364

16.     Courts give broad deference to the business decisions of a debtor in possession. *See, e.g, Richmond Leasing v. Capital Bank*, 762 F.2d 1303, 1309 (5th Cir. 1985). In particular, a bankruptcy court generally will respect a debtor-in-possession's business judgment regarding the need for, and proposed uses of, funds. *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D. N.Y. 1990) (citations omitted).

17.     Section 364(d)(1) of the Bankruptcy Code provides:

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior lien is proposed to be granted.

18.     Generally, Section 364(c) of the Bankruptcy Code requires a debtor to demonstrate that alternative sources of credit are not available under the other provisions of Section 364. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Although there is "no duty to seek credit from every possible lender before concluding that such credit is unavailable," the statute obligates a debtor to show "by a good faith effort that credit was not available without the senior lien." *Bray v. Shenandoah Fed. Sav. and Loan Assoc.* (*In re Snowshoe Co., Inc.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

19.     Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and will accord significant weight to the necessity for obtaining the financing. *See, e.g., In re Snowshoe*, 789 F.2d at 1088; *In re Ames*, 115 B.R. at 40. For example, the need for a swift injection of cash to preserve a debtor's business satisfies the requirements of Section 364(d) when coupled with unsuccessful attempts to locate alternative financing. *See In re,* 115 B.R. at 40; *see also In re Snowshoe*, 789 F.2d at

1088 (primary facts supporting priming liens included lack of alternative financing sources and need to obtain prompt cash infusion to preserve value of debtor's business).

**C.    The Search for the Best DIP Financing Available**

20.    The Debtors made a serious and good faith effort to obtain postpetition financing pursuant to Sections 364(a) and (b) of the Bankruptcy Code.

21.    Aside from the DIP Lender, the Debtor inquired with several financial institutions, various potential equity investors and asset purchasers, as well as seeking cash infusions from related parties and insiders. Ultimately, however, the Debtors were unable to obtain any interest from other funding sources. Based upon this effort, the Debtors concluded that (a) unsecured financing on any basis would not be available, and (b) super-priority claims and liens would, as a practical matter, be the only basis upon which to structure an alternative facility.

22.    The Debtors are comfortable that the proposal contained in the DIP Facility is the best financing available to the Borrowing Debtors.

23.    The Debtors have been in Chapter 11 for nearly two (2) months and have been unable to find alternative sources of financing.

24.    Further, the DIP Lender has extensive experience in the restaurant business and brings a wealth of connections and knowledge that will be instrumental to the Debtors' remaining post-petition operations and a successful reorganization.

25.    The Borrowing Debtors have no unencumbered property.  The Debtors' financial condition and existing blanket liens on all assets make it impossible for the Borrowing Debtors to secure third party financing on terms more favorable than those set forth in the DIP Facility.  Further, the terms of the DIP Facility are reasonable and necessary to maximize the value of the Debtor's bankruptcy estate.

**D.    Need for Postpetition Financing**

26.    Without the funding requested herein, the Borrowing Debtors will not have the funds necessary to satisfy administrative expenses, operate their businesses as separate enterprises, maintain assets (including deferred FF&E and facility maintenance), or pay employees, payroll taxes, insurance,

utilities, suppliers, and other post-petition vendors, overhead, lease expenses and other expenses required for the Debtors' businesses and to maximize the value of the Debtors' estates. Pursuant to Section 364(a) and 364(b) of the Bankruptcy Code, the Borrowing Debtors assert that it they are, jointly and severally, unable to obtain either unsecured credit or secured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense in the amounts and on as favorable terms as are being agreed to by the DIP Lender.

27.     Without the funds contemplated in this Motion, the Borrowing Debtors are rapidly approaching the point when they will not have sufficient liquidity to preserve their operations in both the short- and long-term. As set forth above on an interim basis and pending the Final Hearing, the Debtor needs the proceeds from the DIP Facility in order to continue to pay all necessary expenses. Therefore, interim approval of the proposed financing pending the Final Hearing is in the best interests of the Debtor, its estate and its creditors.

28.     The Borrowing Debtors require an immediate cash injection to be able to make their continued payroll obligations, its lease obligations, to pay professionals, to finally complete deferred FF&E and facility maintenance to maximize revenue, and to pay other necessary and reasonable expenses of the estate. Specifically, if the Borrowing Debtors continue to limp by on a shoestring budget, each Borrowing Debtor will miss out on significant revenue due to operational limitations imposed by deferred maintenance (broken equipment, unavailable seating areas, and the like) during each Borrowing Debtor's busy season.

29.     It is essential to the operation of the Debtor's assets that the Debtor obtain authority to incur postpetition financing to continue ordinary course operations. Only through use of the DIP Facility can the Debtor be assured of a minimal disruption in business operations through the upcoming busy season.

### USE OF CASH COLLATERAL

30.     While the Debtors do not believe that any Secured Creditor has a lien on the Debtors' cash, such that it is entitled to adequate protection, the Debtors – out of an abundance of caution – request Court permission to use cash collateral in order to augment the cash available under the DIP Facility.

31.     The specific financial terms and conditions of the Debtors' proposed use of Cash Collateral are summarized as follows:

a.      <u>Use of Cash Collateral</u>. The Debtors will be permitted to use Cash Collateral subject to the provisions of the DIP Facility and the DIP Interim Order.

b.      <u>Adequate Protection Replacement Lien for the Secured Creditors</u>. As adequate protection for cash collateral (if any) expended by the Debtor to pay expenses set forth in the Budget, the Secured Creditors shall be granted a replacement security interest under Section 361(2) of the Bankruptcy Code in the Debtor's post-petition property and proceeds thereof (excluding the Debtors' rights under Sections 544, 545, 546, 547, 548, 549, and 550 of the Bankruptcy Code), to the same extent and priority as each Secured Creditors' purported security interest in the Debtors' pre-petition property and the proceeds thereof, subject to the DIP Facility and super-priority interest of the DIP Lender and the Carve-Out.

c.      <u>Alternative Adequate Protection.</u> Should any Secured Creditor be deemed to be insufficiently adequately protected by virtue of a replacement lien, the Debtors reserve the right to propose and adequate protection cash payment during the term of the DIP Facility.

### The Lenders' Interests Are Adequately Protected

32.     When a debtor has proposed to use cash collateral, the Court pursuant to Section 363(c) of the Bankruptcy Code, may permit the use of cash collateral so long as the debtor provides "adequate protection of such interest" in accordance with Section 361 of the Bankruptcy Code. Section 361 of the Bankruptcy Code sets forth three non-exclusive examples of adequate protection. *In re Nashua Trust Co.*, 73 B.R. 423, 430 (Bankr. D.N.J. 1987). Adequate protection "is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

33.     Provision of a replacement lien in property equal to the value of the cash collateral used specifically complies with Section 361(2) and provides adequate protection within the meaning of Section

363(e) of the Bankruptcy Code. *See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988). The focus of the requirement of adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Club Associates*, 107 B.R. 385, 394 (Bankr. N.D. Ga. 1989); *Ridgemont Apartment Associates Ltd. v. Atlanta English Village Ltd.*, 110 B.R. 77, 82 (Bankr. N.D. Ga. 1989).

34.     Further, the Debtors do not have cash collateral such that adequate protection is required. The Debtors are restaurants. They do not generate receivables. They sell food and drink for cash or cash equivalents, and credit card receipts process within days. The case law in the Sixth Circuit is clear that restaurant sales are not proceeds of inventory entitling secured lenders to adequate protection. *See In re Lexington Hospitality Grp, LLC,* 2017 WL 5035081 at *13 (Bankr. E.D. Ky 2017) (holding that because restaurant revenue arises primarily from the sale of services rather than inventory, revenue from restaurant sales are not proceeds of inventory, and a creditor holding a lien on inventory is not entitled to adequate protection from the restaurant's sale of inventory as proceeds therefrom).

35.     The Debtors respectfully submit that pursuant to Section 361(2) of the Bankruptcy Code, the adequate protection replacement lien (if any) constitutes adequate protection for the Debtors' use of cash collateral (if any).

## **RELIEF REQUESTED**

36.     By this Motion and pursuant to Sections 361, 362, 363 and 364 of the United States Bankruptcy Code, as supplemented by Bankruptcy Rules 4001 and 9014, the Debtors seek entry of an order, approving on an interim basis (pending a final hearing) the terms and conditions of the DIP Facility set forth in the Interim Order authorizing (a) the Borrowing Debtors to obtain post-petition financing on a senior secured super-priority basis pursuant to §§ 105, 361, 362, 363, and 364; (b) the Debtors to utilize cash collateral pursuant to § 363; (ii) granting adequate protection to prepetition Secured Lenders pursuant to §§ 361, 363 and 364; (iii) scheduling final hearing pursuant to bankruptcy rules 4001(b) and (c); and (iv)

granting related relief (the "DIP Interim Order"), attached hereto as **Exhibit C,** subject to modifications, if any, disclosed at the Interim Hearing.

37.     For the reasons set forth herein and the testimony on behalf of the Debtors at the Expedited Hearing, the Debtors request that the Court enter the Interim DIP Order and schedule a final hearing on the Motion, consistent with Bankruptcy Rule 4001, as soon as possible following fourteen days notice.

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim DIP Order attached hereto as **Exhibit C**.

Respectfully submitted,

/s/ R. Alex Payne
R. Alex Payne
Gray Waldron
Henry E. ("Ned") Hildebrand, IV
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, Tennessee 37212
629.777.6529
alex@dhnashville.com
*Counsel for the Debtors*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2024 this motion has been served on (i) all parties consenting to electronic service via the Court's CM/ECF system, (ii) the Office of the United States Trustee via email, (iii) the 20 largest creditors and all secured creditors via email, fax, or U.S. mail. This motion has also been emailed to all parties asserting a security interest in the Debtor's cash collateral.

/s/ R. Alex Payne
R. Alex Payne

**EXHIBIT A**

**DIP TERM SHEET**

THE INITIAL KEY POINTS OF THE DEBTOR IN POSESSION LOAN ARE DEFINED BELOW IN THIS LETTER OF INTENT

| | |
|---|---|
| BORROWER(S): | J & S Concepts LLC; Party Fowl Donelson LLC; Party Fowl Murfreesboro LLC; and Party Fowl Cool Springs LLC |
| DIP FACILITY: | A multiple draw secured super senior loan facility (the "DIP Facility") in an aggregate principal amount not to exceed $300,000. Advances to be subject to minimum initial draws of $25,000 per entity and subsequent draws in increments of $10,000. |
| DIP LENDER(S): | An affiliate or subsidiary of Hargett Hunter Capital Management, LLC ("HH"), or any non-affiliated party or parties as designated at the sole discretion of HH prior to the initial funding of the DIP Facility (collectively, the "DIP Lenders"). |
| TERM DATE / MATURITY: | Unless extended by written agreement of the Parties, the earlier of: (i) 90 days after initial funding ("Final Maturity Date"), (ii) the date on which a sale of all or substantially all of the assets of the Borrowers is consummated, (iii) the date the DIP Facility is accelerated upon the occurrence and declaration of an Event of Default, (iv) the date that the DIP Facility shall become due and payable in full hereunder or pursuant to the DIP Orders, whether by acceleration or otherwise; or (v) the date that the Borrowers' Chapter 11 Plan becomes effective (each, the "Maturity"). |
| EFFECTIVE DATE OF DIP: | Date of entry of Interim DIP Order. |
| COLLATERAL: | Pursuant to sections 364(c) and (d) of the Bankruptcy Code, all obligations of the Borrower under the DIP Facility ("DIP Obligations") will be secured by security interests in all of the Borrower's and its bankruptcy estate's assets (the "Collateral"), including, subject to the entry of the Final DIP Order, proceeds and rights in respect of avoidance actions under sections 502(d), 510, 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code ("Avoidance Actions"). Collateral shall include all property that is not subject to a security interest or lien as of the Petition Date and property that is covered by a security interest or lien as of the Petition Date. Such liens on the Collateral will be valid, enforceable, and perfected first-priority priming liens and security interests, with priority over any and all prepetition or post-petition liens, security interests, and other interests including any and all mechanics and materialmen's liens ("M&M Liens") and shall be subject and junior only to (i) the Carve-Out Expenses and (ii) the Budgeted Expenses. The DIP Lender shall also have a super-priority administrative expense under section 364(c)(1) of the Bankruptcy Code against the Borrower for the amount of all obligations under the DIP Facility, subject only to the Carve-Out Expenses and Budgeted Expenses. No person other than the DIP Lender shall have a lien on the collateral, except for (i) the liens existing as of the Petition Date and (ii) M&M Liens (it being understood that pursuant to the DIP Orders any and all such liens will be junior to the DIP Facility). |
| CARVE-OUT EXPENSES: | Carve-Out Expenses shall include approved Professional Fees of the Borrowers' counsel, accountants, and the Subchapter V Trustee in an amount up to $60,000, |

retroactive to the Petition Date. Carve-Out Expenses will be paid directly by the DIP Lenders and allocated equally to each Borrower.

FACILITY FEE: Facility Fee of $10,000 per Borrower due upon entry of Interim DIP Order, added to the DIP Facility (but not decreasing the amount of the aggregate DIP Facility available to each borrower).

EXPENSES: The Borrowers shall pay or reimburse upon submission of all reasonable and documented costs and expenses associated with the preparation, due diligence, administration and closing of all DIP Facility Documents, including, without limitation, the reasonable and documented legal fees and expenses of counsel to the DIP Lender, and the Borrowers shall reimburse the expenses of the DIP Lender in connection with the enforcement of any DIP Facility Documents, including expenses of counsel. All Expenses are to be paid to DIP Lender from the DIP Facility within 5 business days of expenses and documentation being submitted to Borrowers.

INTEREST RATE: 15% per annum on the average portion of the DIP Facility outstanding in any given month, compounded monthly.

DEFAULT RATE: The default rate shall be 2% payable upon and during continuance of event of default. The payment may be deferred for a period up to ninety days if requested by the Borrowers due to liquidity constraints and if consented to by the DIP Lender in the DIP Lender' sole discretion.

USE OF PROCEEDS: The Borrowers shall, in accordance with the DIP Facility Documents and the Budget and as required by any DIP Orders and any orders entered by the Court, such orders being in form and substance satisfactory to the DIP Lender, use the proceeds of the DIP Loans for (a) general corporate purposes, (b) interest, premiums, and fees payable hereunder and under the DIP Facility Documents; (c) restructuring costs and professional fees relating to the Chapter 11 Case in accordance with the terms hereof, the DIP Facility Documents, and the Budget; and (d) adequate protection payments.

DIP FACILITY DOCUMENTS: DIP Facility Documents including Conditions of DIP Facility, requirements of Borrowers to be provided by DIP Lenders, definition of Collateral, definition and terms of default, repayment terms and options, covenants, remedies for event of default, and any other definitions applicable to DIP Facility.


THIS DOCUMENT IS NOT BINDING ON THE PARTIES AND MAY BE AMENDED AND SUPPLEMENTED FROM TIME TO TIME. NO FUNDS SHALL BE ADVANCED UNTIL APPROVAL BY THE BANKRUPTCY COURT AND EXECUTION OF A DEFINITIVE AGREEMENT.

**EXHIBIT B**

**BUDGET**

**Party Fowl**

Cash Flow Launcher ™

Key Schedule

| Sales and Collections | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | | |
| Total Sales | $186,851 | $186,851 | $252,687 | $252,687 | $252,687 | $252,687 | $249,249 | $264,526 | $264,526 | $264,526 | $264,526 | $264,526 | $279,726 | $3,236,059 | $248,928 |
| **Operating Collections** | | | | | | | | | | | | | | | |
| Sales Collections | $186,851 | $186,851 | $252,687 | $252,687 | $252,687 | $252,687 | $249,249 | $264,526 | $264,526 | $264,526 | $264,526 | $264,526 | $279,726 | $3,236,059 | $248,928 |
| Other Operating Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Collections | $186,851 | $186,851 | $252,687 | $252,687 | $252,687 | $252,687 | $249,249 | $264,526 | $264,526 | $264,526 | $264,526 | $264,526 | $279,726 | $3,236,059 | $248,928 |
| **Non-Operating Collections** | | | | | | | | | | | | | | | |
| Assets Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Non-Operating Collections | 5,966 | 5,966 | 5,966 | 5,966 | 5,966 | 5,966 | 5,966 | 4,773 | 4,773 | 4,773 | 4,773 | 4,773 | 5,966 | 71,589 | 5,507 |
| Total Non-Operating Collections | $5,966 | $5,966 | $5,966 | $5,966 | $5,966 | $5,966 | $5,966 | $4,773 | $4,773 | $4,773 | $4,773 | $4,773 | $5,966 | $71,589 | $5,507 |
| Total Collections | $192,817 | $192,817 | $258,653 | $258,653 | $258,653 | $258,653 | $255,214 | $269,299 | $269,299 | $269,299 | $269,299 | $269,299 | $285,692 | $3,307,647 | $254,434 |
| Cumulative Collections | $192,817 | $385,634 | $644,287 | $902,941 | $1,161,594 | $1,420,247 | $1,675,461 | $1,944,760 | $2,214,059 | $2,483,358 | $2,752,657 | $3,021,956 | $3,307,647 | | |

| Purchases and Disbursements | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| COGS | $58,749 | $58,749 | $74,141 | $74,141 | $74,141 | $74,141 | $71,403 | $70,655 | $70,655 | $70,655 | $70,655 | $70,655 | $88,747 | $927,485 | $71,345 |
| Utilities | 7,806 | - | - | 36,204 | - | - | - | 36,204 | - | - | - | 36,204 | - | 116,419 | 8,955 |
| Insurance | 3,488 | 3,488 | - | - | - | - | 2,980 | 3,581 | 3,581 | 3,581 | 3,581 | 3,581 | 7,426 | 35,288 | 2,714 |
| Professional Fees | 51,000 | - | - | 3,000 | - | - | - | 3,000 | - | - | - | 3,000 | - | 60,000 | 4,615 |
| Sales and Use and Liquor by Drink Taxes | 20,670 | 20,670 | 27,954 | 27,954 | 27,954 | 27,954 | 27,573 | 29,263 | 29,263 | 29,263 | 29,263 | 29,263 | 30,945 | 357,989 | 27,538 |
| Other Operating Disbursements | 7,695 | 7,695 | 16,352 | 16,352 | 16,352 | 16,352 | 14,823 | 14,680 | 14,680 | 14,680 | 14,680 | 14,680 | 7,850 | 176,873 | 13,606 |
| Payroll and Payroll Expenses | 87,335 | 87,335 | 98,248 | 98,248 | 98,248 | 98,248 | 103,606 | 118,356 | 118,356 | 118,356 | 118,356 | 118,356 | 116,303 | 1,379,352 | 106,104 |
| Occupancy Costs | 75,400 | - | - | 88,742 | - | - | - | 88,742 | - | - | - | 88,742 | - | 341,626 | 26,279 |
| Total Operating Disbursements | $312,143 | $177,937 | $216,695 | $344,641 | $216,695 | $216,695 | $220,386 | $364,482 | $236,536 | $236,536 | $236,536 | $364,482 | $251,270 | $3,395,033 | 261,156 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Term Debt, Fees, Interest, etc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Wires | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| MCA Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc. Transactions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Disbursements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Disbursements | $312,143 | $177,937 | $216,695 | $344,641 | $216,695 | $216,695 | $220,386 | $364,482 | $236,536 | $236,536 | $236,536 | $364,482 | $251,270 | $3,395,033 | $261,156 |
| Cumulative Disbursements | $312,143 | $490,080 | $706,775 | $1,051,416 | $1,268,111 | $1,484,805 | $1,705,192 | $2,069,674 | $2,306,209 | $2,542,745 | $2,779,281 | $3,143,763 | $3,395,033 | | |
| Net Cash Flow | $(119,326) | $14,880 | $41,958 | $(85,988) | $41,958 | $41,958 | $34,828 | $(95,183) | $32,763 | $32,763 | $32,763 | $(95,183) | $34,422 | $(87,385) | $(6,722) |
| Cumulative Cash Flow | $(119,326) | $(104,446) | $(62,487) | $(148,475) | $(106,517) | $(64,559) | $(29,731) | $(124,914) | $(92,150) | $(59,387) | $(26,624) | $(121,807) | $(87,385) | | |

**Party Fowl Nashville**

Cash Flow Launcher ™

Key Schedule

| Sales and Collections | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | 13-Week Metrics Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | | |
| Total Sales | $47,342 | $47,342 | $85,480 | $85,480 | $85,480 | $85,480 | $85,305 | $90,534 | $90,534 | $90,534 | $90,534 | $90,534 | $87,485 | $1,062,065 | $81,697 |
| **Operating Collections** | | | | | | | | | | | | | | | |
| Sales Collections | $47,342 | $47,342 | $85,480 | $85,480 | $85,480 | $85,480 | $85,305 | $90,534 | $90,534 | $90,534 | $90,534 | $90,534 | $87,485 | $1,062,065 | $81,697 |
| Other Operating Collections | | | | | | | | | | | | | | | |
| Total Operating Collections | $47,342 | $47,342 | $85,480 | $85,480 | $85,480 | $85,480 | $85,305 | $90,534 | $90,534 | $90,534 | $90,534 | $90,534 | $87,485 | $1,062,065 | $81,697 |
| **Non-Operating Collections** | | | | | | | | | | | | | | | |
| Assets Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Non-Operating Collections | 2,983 | 2,983 | 2,983 | 2,983 | 2,983 | 2,983 | 2,983 | 2,386 | 2,386 | 2,386 | 2,386 | 2,386 | 2,983 | 35,794 | 2,753 |
| Total Non-Operating Collections | $2,983 | $2,983 | $2,983 | $2,983 | $2,983 | $2,983 | $2,983 | $2,386 | $2,386 | $2,386 | $2,386 | $2,386 | $2,983 | $35,794 | $2,753 |
| Total Collections | $50,325 | $50,325 | $88,463 | $88,463 | $88,463 | $88,463 | $88,288 | $92,920 | $92,920 | $92,920 | $92,920 | $92,920 | $90,468 | $1,097,859 | $84,451 |
| Cumulative Collections | $50,325 | $100,649 | $189,113 | $277,576 | $366,039 | $454,502 | $542,790 | $635,710 | $728,630 | $821,551 | $914,471 | $1,007,391 | $1,097,859 | | |

| Purchases and Disbursements | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | 13-Week Metrics Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| COGS | $13,717 | $13,717 | $24,767 | $24,767 | $24,767 | $24,767 | $19,361 | $19,557 | $19,557 | $19,557 | $19,557 | $19,557 | $25,348 | $268,995 | $20,692 |
| Utilities | 7,806 | - | - | 7,806 | - | - | - | 7,806 | - | - | - | 7,806 | - | 31,224 | 2,402 |
| Insurance | 3,333 | 3,333 | - | - | - | - | 2,827 | 3,459 | 3,459 | 3,459 | 3,459 | 3,459 | 7,290 | 34,079 | 2,621 |
| Professional Fees | 12,250 | - | - | 750 | - | - | - | 750 | - | - | - | 750 | - | 14,500 | 1,115 |
| Sales and Use and Liquor by Drink Taxes | 5,237 | 5,237 | 9,456 | 9,456 | 9,456 | 9,456 | 9,437 | 10,015 | 10,015 | 10,015 | 10,015 | 10,015 | 9,678 | 117,491 | 9,038 |
| Other Operating Disbursements | 2,285 | 2,285 | 5,138 | 5,138 | 5,138 | 5,138 | 4,634 | 5,808 | 5,808 | 5,808 | 5,808 | 5,808 | 3,598 | 62,393 | 4,799 |
| Payroll and Payroll Expenses | 24,326 | 24,326 | 33,728 | 33,728 | 33,728 | 33,728 | 33,685 | 36,913 | 36,913 | 36,913 | 36,913 | 36,913 | 33,506 | 435,322 | 33,486 |
| Occupancy Costs | 13,296 | - | - | 26,067 | - | - | - | 26,067 | - | - | - | 26,067 | - | 91,497 | 7,038 |
| Total Operating Disbursements | $82,249 | $48,897 | $73,090 | $107,713 | $73,090 | $73,090 | $69,944 | $110,376 | $75,753 | $75,753 | $75,753 | $110,376 | $79,420 | $1,055,501 | 81,192 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Term Debt, Fees, Interest, etc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Wires | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| MCA Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc. Transactions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Disbursements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Disbursements | $82,249 | $48,897 | $73,090 | $107,713 | $73,090 | $73,090 | $69,944 | $110,376 | $75,753 | $75,753 | $75,753 | $110,376 | $79,420 | $1,055,501 | $81,192 |
| Cumulative Disbursements | $82,249 | $131,147 | $204,236 | $311,949 | $385,038 | $458,128 | $528,072 | $638,448 | $714,200 | $789,953 | $865,705 | $976,081 | $1,055,501 | | |
| Net Cash Flow | $(31,925) | $1,427 | $15,374 | $(19,249) | $15,374 | $15,374 | $18,344 | $(17,455) | $17,168 | $17,168 | $17,168 | $(17,455) | $11,048 | $42,358 | $3,258 |
| Cumulative Cash Flow | $(31,925) | $(30,497) | $(15,124) | $(34,373) | $(18,999) | $(3,626) | $14,718 | $(2,738) | $14,430 | $31,598 | $48,765 | $31,310 | $42,358 | | |

# Party Fowl Donelson

**Cash Flow Launcher ™**

Key Schedule

| Sales and Collections | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | | |
| Total Sales | $71,431 | $71,431 | $82,927 | $82,927 | $82,927 | $82,927 | $79,740 | $84,628 | $84,628 | $84,628 | $84,628 | $84,628 | $98,514 | $1,075,964 | $82,766 |
| **Operating Collections** | | | | | | | | | | | | | | | |
| Sales Collections | $71,431 | $71,431 | $82,927 | $82,927 | $82,927 | $82,927 | $79,740 | $84,628 | $84,628 | $84,628 | $84,628 | $84,628 | $98,514 | $1,075,964 | $82,766 |
| Other Operating Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Collections | $71,431 | $71,431 | $82,927 | $82,927 | $82,927 | $82,927 | $79,740 | $84,628 | $84,628 | $84,628 | $84,628 | $84,628 | $98,514 | $1,075,964 | $82,766 |
| **Non-Operating Collections** | | | | | | | | | | | | | | | |
| Assets Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Non-Operating Collections | 2,983 | 2,983 | 2,983 | 2,983 | 2,983 | 2,983 | 2,983 | 2,386 | 2,386 | 2,386 | 2,386 | 2,386 | 2,983 | 35,794 | 2,753 |
| Total Non-Operating Collections | $2,983 | $2,983 | $2,983 | $2,983 | $2,983 | $2,983 | $2,983 | $2,386 | $2,386 | $2,386 | $2,386 | $2,386 | $2,983 | $35,794 | $2,753 |
| Total Collections | $74,413 | $74,413 | $85,910 | $85,910 | $85,910 | $85,910 | $82,723 | $87,014 | $87,014 | $87,014 | $87,014 | $87,014 | $101,497 | $1,111,758 | $85,520 |
| Cumulative Collections | $74,413 | $148,827 | $234,737 | $320,646 | $406,556 | $492,466 | $575,189 | $662,204 | $749,218 | $836,233 | $923,247 | $1,010,261 | $1,111,758 | | |

| Purchases and Disbursements | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| COGS | $24,741 | $24,741 | $24,416 | $24,416 | $24,416 | $24,416 | $25,605 | $23,389 | $23,389 | $23,389 | $23,389 | $23,389 | $30,538 | $320,231 | $24,633 |
| Utilities | 12,770 | - | - | 12,770 | - | - | - | 12,770 | - | - | - | 12,770 | - | 51,079 | 3,929 |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | 12,250 | - | - | 750 | - | - | - | 750 | - | - | - | 750 | - | 14,500 | 1,115 |
| Sales and Use and Liquor by Drink Taxes | 7,902 | 7,902 | 9,174 | 9,174 | 9,174 | 9,174 | 8,821 | 9,362 | 9,362 | 9,362 | 9,362 | 9,362 | 10,898 | 119,029 | 9,156 |
| Other Operating Disbursements | 1,719 | 1,719 | 5,043 | 5,043 | 5,043 | 5,043 | 4,705 | 4,076 | 4,076 | 4,076 | 4,076 | 4,076 | 1,935 | 50,631 | 3,895 |
| Payroll and Payroll Expenses | 35,200 | 35,200 | 34,876 | 34,876 | 34,876 | 34,876 | 36,660 | 44,150 | 44,150 | 44,150 | 44,150 | 44,150 | 45,771 | 513,087 | 39,468 |
| Occupancy Costs | 20,700 | - | - | 20,700 | - | - | - | 20,700 | - | - | - | 20,700 | - | 82,800 | 6,369 |
| Total Operating Disbursements | $115,282 | $69,562 | $73,509 | $107,729 | $73,509 | $73,509 | $75,792 | $115,197 | $80,977 | $80,977 | $80,977 | $115,197 | $89,142 | $1,151,357 | 88,566 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Term Debt, Fees, Interest, etc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Wires | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| MCA Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc. Transactions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Disbursements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Disbursements | $115,282 | $69,562 | $73,509 | $107,729 | $73,509 | $73,509 | $75,792 | $115,197 | $80,977 | $80,977 | $80,977 | $115,197 | $89,142 | $1,151,357 | $88,566 |
| Cumulative Disbursements | $115,282 | $184,844 | $258,353 | $366,082 | $439,590 | $513,099 | $588,891 | $704,088 | $785,065 | $866,042 | $947,018 | $1,062,215 | $1,151,357 | | |
| Net Cash Flow | $(40,869) | $4,851 | $12,401 | $(21,819) | $12,401 | $12,401 | $6,931 | $(28,182) | $6,038 | $6,038 | $6,038 | $(28,182) | $12,355 | $(39,599) | $(3,046) |
| Cumulative Cash Flow | $(40,869) | $(36,018) | $(23,617) | $(45,435) | $(33,034) | $(20,633) | $(13,702) | $(41,884) | $(35,847) | $(29,809) | $(23,771) | $(51,954) | $(39,599) | | |

# Party Fowl Murfreesboro

Cash Flow Launcher ™

Key Schedule

| Sales and Collections | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | 13-Week Metrics Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | | |
| Total Sales | $30,889 | $30,889 | $41,214 | $41,214 | $41,214 | $41,214 | $39,630 | $42,059 | $42,059 | $42,059 | $42,059 | $42,059 | $42,017 | $518,574 | $39,890 |
| **Operating Collections** | | | | | | | | | | | | | | | |
| Sales Collections | $30,889 | $30,889 | $41,214 | $41,214 | $41,214 | $41,214 | $39,630 | $42,059 | $42,059 | $42,059 | $42,059 | $42,059 | $42,017 | $518,574 | $39,890 |
| Other Operating Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Collections | $30,889 | $30,889 | $41,214 | $41,214 | $41,214 | $41,214 | $39,630 | $42,059 | $42,059 | $42,059 | $42,059 | $42,059 | $42,017 | $518,574 | $39,890 |
| **Non-Operating Collections** | | | | | | | | | | | | | | | |
| Assets Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Non-Operating Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Total Collections | $30,889 | $30,889 | $41,214 | $41,214 | $41,214 | $41,214 | $39,630 | $42,059 | $42,059 | $42,059 | $42,059 | $42,059 | $42,017 | $518,574 | $39,890 |
| Cumulative Collections | $30,889 | $61,777 | $102,991 | $144,204 | $185,418 | $226,632 | $266,262 | $308,321 | $350,380 | $392,439 | $434,498 | $476,557 | $518,574 | | |

| Purchases and Disbursements | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | 13-Week Metrics Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| COGS | $9,316 | $9,316 | $12,430 | $12,430 | $12,430 | $12,430 | $11,952 | $13,999 | $13,999 | $13,999 | $13,999 | $13,999 | $16,236 | $166,531 | $12,810 |
| Utilities | 5,886 | - | - | 5,886 | - | - | - | 5,886 | - | - | - | 5,886 | - | 23,544 | 1,811 |
| Insurance | 155 | 155 | - | - | - | - | 153 | 122 | 122 | 122 | 122 | 122 | 135 | 1,210 | 93 |
| Professional Fees | 12,250 | - | - | 750 | - | - | - | 750 | - | - | - | 750 | - | 14,500 | 1,115 |
| Sales and Use and Liquor by Drink Taxes | 3,417 | 3,417 | 4,559 | 4,559 | 4,559 | 4,559 | 4,384 | 4,653 | 4,653 | 4,653 | 4,653 | 4,653 | 4,648 | 57,367 | 4,413 |
| Other Operating Disbursements | 772 | 772 | 2,153 | 2,153 | 2,153 | 2,153 | 1,678 | 1,509 | 1,509 | 1,509 | 1,509 | 1,509 | 684 | 20,067 | 1,544 |
| Payroll and Payroll Expenses | 13,890 | 13,890 | 14,297 | 14,297 | 14,297 | 14,297 | 16,232 | 18,153 | 18,153 | 18,153 | 18,153 | 18,153 | 17,520 | 209,486 | 16,114 |
| Occupancy Costs | 7,475 | - | - | 7,475 | - | - | - | 7,475 | - | - | - | 7,475 | - | 29,900 | 2,300 |
| Total Operating Disbursements | $53,162 | $27,551 | $33,440 | $47,550 | $33,440 | $33,440 | $34,400 | $52,546 | $38,435 | $38,435 | $38,435 | $52,546 | $39,224 | $522,604 | 40,200 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Term Debt, Fees, Interest, etc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Wires | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| MCA Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc. Transactions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Disbursements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Disbursements | $53,162 | $27,551 | $33,440 | $47,550 | $33,440 | $33,440 | $34,400 | $52,546 | $38,435 | $38,435 | $38,435 | $52,546 | $39,224 | $522,604 | $40,200 |
| Cumulative Disbursements | $53,162 | $80,712 | $114,152 | $161,702 | $195,141 | $228,581 | $262,981 | $315,527 | $353,963 | $392,398 | $430,834 | $483,380 | $522,604 | | |
| Net Cash Flow | $(22,273) | $3,338 | $7,774 | $(6,337) | $7,774 | $7,774 | $5,230 | $(10,487) | $3,624 | $3,624 | $3,624 | $(10,487) | $2,794 | $(4,030) | $(310) |
| Cumulative Cash Flow | $(22,273) | $(18,935) | $(11,161) | $(17,497) | $(9,723) | $(1,949) | $3,281 | $(7,207) | $(3,583) | $40 | $3,664 | $(6,823) | $(4,030) | | |

**Party Fowl Cool Springs**

Cash Flow Launcher ™

Key Schedule

| Sales and Collections | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | | |
| Total Sales | $37,190 | $37,190 | $43,067 | $43,067 | $43,067 | $43,067 | $44,573 | $47,305 | $47,305 | $47,305 | $47,305 | $47,305 | $51,710 | $579,456 | $44,574 |
| **Operating Collections** | | | | | | | | | | | | | | | |
| Sales Collections | $37,190 | $37,190 | $43,067 | $43,067 | $43,067 | $43,067 | $44,573 | $47,305 | $47,305 | $47,305 | $47,305 | $47,305 | $51,710 | $579,456 | $44,574 |
| Other Operating Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Collections | $37,190 | $37,190 | $43,067 | $43,067 | $43,067 | $43,067 | $44,573 | $47,305 | $47,305 | $47,305 | $47,305 | $47,305 | $51,710 | $579,456 | $44,574 |
| **Non-Operating Collections** | | | | | | | | | | | | | | | |
| Assets Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Non-Operating Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Collections | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Total Collections | $37,190 | $37,190 | $43,067 | $43,067 | $43,067 | $43,067 | $44,573 | $47,305 | $47,305 | $47,305 | $47,305 | $47,305 | $51,710 | $579,456 | $44,574 |
| Cumulative Collections | $37,190 | $74,381 | $117,447 | $160,514 | $203,581 | $246,647 | $291,220 | $338,526 | $385,831 | $433,136 | $480,441 | $527,747 | $579,456 | | |

| Purchases and Disbursements | Week 1 3/11 3/17 Projected | Week 2 3/18 3/24 Projected | Week 3 3/25 3/31 Projected | Week 4 4/1 4/7 Projected | Week 5 4/8 4/14 Projected | Week 6 4/15 4/21 Projected | Week 7 4/22 4/28 Projected | Week 8 4/29 5/5 Projected | Week 9 5/6 5/12 Projected | Week 10 5/13 5/19 Projected | Week 11 5/20 5/26 Projected | Week 12 5/27 6/2 Projected | Week 13 6/3 6/9 Projected | 13-Week Metrics Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| COGS | $10,975 | $10,975 | $12,528 | $12,528 | $12,528 | $12,528 | $14,485 | $13,711 | $13,711 | $13,711 | $13,711 | $13,711 | $16,625 | $171,729 | $13,210 |
| Utilities | 9,743 | - | - | 9,743 | - | - | - | 9,743 | - | - | - | 9,743 | - | 38,971 | 2,998 |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | 12,250 | - | - | 750 | - | - | - | 750 | - | - | - | 750 | - | 14,500 | 1,115 |
| Sales and Use and Liquor by Drink Taxes | 4,114 | 4,114 | 4,764 | 4,764 | 4,764 | 4,764 | 4,931 | 5,233 | 5,233 | 5,233 | 5,233 | 5,233 | 5,720 | 64,102 | 4,931 |
| Other Operating Disbursements | 2,918 | 2,918 | 4,018 | 4,018 | 4,018 | 4,018 | 3,806 | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 1,632 | 43,781 | 3,368 |
| Payroll and Payroll Expenses | 13,919 | 13,919 | 15,346 | 15,346 | 15,346 | 15,346 | 17,028 | 19,140 | 19,140 | 19,140 | 19,140 | 19,140 | 19,506 | 221,457 | 17,035 |
| Occupancy Costs | 34,500 | - | - | 34,500 | - | - | - | 34,500 | - | - | - | 34,500 | - | 138,000 | 10,615 |
| Total Operating Disbursements | $88,420 | $31,927 | $36,657 | $81,650 | $36,657 | $36,657 | $40,250 | $86,363 | $41,371 | $41,371 | $41,371 | $86,363 | $43,484 | $692,540 | 53,272 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Term Debt, Fees, Interest, etc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Wires | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| MCA Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc. Transactions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Disbursements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Disbursements | $88,420 | $31,927 | $36,657 | $81,650 | $36,657 | $36,657 | $40,250 | $86,363 | $41,371 | $41,371 | $41,371 | $86,363 | $43,484 | $692,540 | $53,272 |
| Cumulative Disbursements | $88,420 | $120,347 | $157,004 | $238,653 | $275,310 | $311,968 | $352,218 | $438,581 | $479,952 | $521,322 | $562,693 | $649,056 | $692,540 | | |
| Net Cash Flow | $(51,230) | $5,263 | $6,410 | $(38,583) | $6,410 | $6,410 | $4,323 | $(39,058) | $5,935 | $5,935 | $5,935 | $(39,058) | $8,226 | $(113,084) | $(8,699) |
| Cumulative Cash Flow | $(51,230) | $(45,966) | $(39,557) | $(78,140) | $(71,730) | $(65,320) | $(60,997) | $(100,055) | $(94,121) | $(88,186) | $(82,252) | $(121,310) | $(113,084) | | |

**EXHIBIT C**

**INTERIM DIP ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **J & S CONCEPTS LLC;** | ) | Case No: 3:24-bk-00066 |
| **PARTY FOWL COOL SPRINGS LLC;** | ) | |
| **PARTY FOWL DESTIN LLC;** | ) | Chapter 11, Subchapter V |
| **PARTY FOWL DONELSON LLC;** | ) | Judge Randal S. Mashburn |
| **PARTY FOWL HAMILTON PLACE LLC;** | ) | |
| **PARTY FOWL MURFREESBORO LLC;** | ) | (Jointly Administered)[3] |
| | ) | |
| Debtors. | ) | |

**ORDER GRANTING EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO: (A) OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED SUPER-PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364; (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. § 361; (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c); AND (IV) GRANTING RELATED RELIEF**

This matter is before the Court on Debtors' motion for debtor-in-possession financing (the "Motion") seeking an order (1) approving postpetition financing in the form of a revolving credit facility (the "DIP Facility"), the terms of which were described in the Motion and are more fully set forth on **Exhibit A** hereto, with Hargett Hunter Capital Management, LLC, or an affiliate, subsidiary, or assignee thereof (the "DIP Lender"), (2) granting liens and providing super-priority administrative expense status pursuant to 11 U.S.C. §§ 364(c) and (d), (3) authorizing use of cash collateral and providing adequate protection pursuant to 11 U.S.C. §§ 361 and 363, (4) setting final hearing, and (5) granting related relief pursuant to Rule 4001 of the Federal Rules of Bankruptcy. Based upon the Court's review of the Motion and all matters brought to the Court's attention at the interim hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) (the "Interim Hearing"), after

---

[3] The Debtors' respective tax identification numbers (last four digits) and case numbers are: J & S Concepts LLC, Tax ID No. 2361, at Case No. 24-0066; Party Fowl Cool Springs LLC, Tax ID No. 0522, at Case No. 24-0067; Party Fowl Destin LLC, Tax ID No. 4062, at Case No. 24-0068; Party Fowl Donelson LLC, Tax ID No. 4323, at Case No. 24-0069; Party Fowl Hamilton Place LLC, Tax ID No. 4514, at Case No. 24-0070; and Party Fowl Murfreesboro LLC, Tax ID No. 8304, at Case No. 24-0071.

due deliberation and consideration, and no objections having been filed, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW and hereby ORDERS as follows:

1. <u>Grant of Motion; Authorization of Interim Financing and Use of Cash Collateral</u>. The Motion is hereby GRANTED on an interim basis, and the Court hereby authorizes and approves the Borrowing Debtors' request for authority to obtain post-petition funding by way of the DIP Facility (as that term is defined in the Motion, and which shall hereafter be referred to as the "DIP Facility") on an interim basis to pay necessary administrative expense amounts. Prior to the final hearing on the Motion, the Debtors are limited to incurring $200,000 in aggregate obligations arising from the DIP Facility ($50,000 per Debtor, inclusive of each Debtor's share of approved administrative expenses). Debtor's ability to obtain additional funding shall be determined at the final hearing; however, even beyond a final hearing, Debtor is not authorized to incur funding amounts beyond the maximum DIP Facility amount of $300,000 plus interest and fees, absent Court approval.

2. <u>Final Hearing/Objection Deadline</u>. The Final Hearing shall be held at 9:30 am on March 19, 2024, in Courtroom 1, Customs House, 701 Broadway, Nashville, Tennessee. Objections shall be filed on or before March 15, 2024.

3. <u>Need for Financing</u>. An immediate and ongoing need exists for the Borrowing Debtors to obtain financing to continue Debtors' operation as debtors-in-possession under Chapter 11 of the Bankruptcy Code and to minimize disruption of Debtors' business.

4. <u>Super-Priority Claim.</u> All post-petition obligations of each Borrowing Debtor to the DIP Lender shall have administrative priority in accordance with, and shall constitute an allowed super-priority claim pursuant to, Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in Debtor's case of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 503(a), 503(b), 506(e), 507(a), 507(b), 546(c), 726, 1113 or 1114 of the Bankruptcy Code.

5.    Grant of and Priority of Post-Petition Liens and Security Interests. All advances made by DIP Lender, plus all interest, fees, and expenses (including reasonable legal fees incurred by DIP Lender) and all other post-petition obligations of Debtor to DIP Lender, shall be secured by a valid, perfected, senior, first priority and superpriority lien and security interest in and to each Borrowing Debtor's assets now existing and hereafter arising, which shall be valid and perfected without the necessity of the filing of any UCC financing statement or establishing any segregated bank accounts or entering into any control agreements with any depository institution, and which liens and security interests shall at all times be senior to the rights of Debtors and all other parties, including the offset rights with respect to any loans or credit extensions to the Debtors by any depository institution with whom the Debtors' funds may be deposited, in this case under the Code, including any parties which may be beneficiaries of adequate protection heretofore granted by this Court, and secured by a valid and perfected lien and security interest in all assets of the Debtor of any kind or nature existing pre-petition, subject to any valid and perfected pre-existing liens therein.

6.    Repayment. All post-petition obligations shall be due and payable, and shall be paid, to the DIP Lender as and when provided in the DIP Facility.

7.    Automatic Perfection of Liens. All liens and security interests granted to DIP Lender herein to secure the post-petition obligations shall be deemed valid, binding, enforceable and perfected upon entry of this Order. DIP Lender shall not be required to establish a restricted or blocked account or enter into, with the Debtors, any control agreement, and further shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including possession of any of the Collateral) in order to validate the perfection of the liens.

8.    Section 364(e) Finding. The Court finds that any extension of credit hereunder by the DIP Lender shall be deemed an extension in good faith.

9.    Pre-Petition Security Interests. Several parties appear to assert an interest in each Debtor's cash collateral. These parties are hereinafter referred to as the "Secured Creditors." Debtor

specifically reserves the right to challenge the lien perfection and priority of each of the following Secured Creditors, and except for the interim relief granted herein, the Court makes no further findings with respect to priority or perfection. The Borrowing Debtors had, as of the Petition Date, various parties purporting to assert a blanket lien (or a near blanket lien) on the Borrowing Debtors' assets, described above as the Secured Lenders and set forth again here:

> a. Party Fowl Nashville (J & S Concepts) – Studio Bank, U.S. Small Business Administration, VOX Funding, UFS Funding, and WebBank d/b/a Toast Capital;
>
> b. Party Fowl Murfreesboro - Regions Bank; Rewards Network;
>
> c. Party Fowl Donelson – Regions Bank; Rewards Network; and
>
> d. Party Fowl Cool Springs – ServisFirst Bank; WebBank d/b/a Toast Capital.

10. <u>Good Cause Shown</u>: The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2). Absent entry of the Interim Order, the Debtors' business, property and the estate will be immediately and irreparably harmed. This Court concludes that good cause has been shown and entry of this Interim Order is in the best interests of the Debtors' estate sand creditors as its implementation will, among other things, allow for the continued operation of each Borrowing Debtor's business and enhance the Debtors' prospects for a successful reorganization.

11. <u>Use of Cash Collateral</u>**.** The Debtor is authorized to use cash until a final hearing on the Motion in accordance with the Budget attached to the Motion as **<u>Exhibit B</u>** and which may be amended prior to a final hearing on the Motion.

12. <u>Adequate Protection</u>**.** Subject to the provisions of Paragraphs 4 and 5 hereof, and pending a final hearing on the Motion, as interim adequate protection for the use of, and any diminution in the value of, the collateral, the Secured Creditors are each granted a replacement security interest under Section 361(2) of the Bankruptcy Code in the Debtor's post-petition property and proceeds thereof (excluding the Debtors' rights under Sections 544, 545, 546, 547, 548, 549, and 550 of the Bankruptcy Code), to the same extent and priority as each Secured Creditors'

purported security interest (if any) in the Debtors' pre-petition property and the proceeds thereof, subject to the DIP Facility and super-priority interest of the DIP Lender.

        a.    *Automatic Perfection.* For the limited purpose of this Interim Order, the replacement liens and security interests granted herein (if any) shall be deemed perfected upon entry of this Order without the necessity of any of the Secured Creditors taking possession of any collateral or filing financing statements or other documents.

13.    <u>Service of Motion</u>. Debtors have certified that copies of the Motion and notice of the Interim Hearing have been served by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the United States Trustee (the "U.S. Trustee"), counsel for the DIP Lender, and the 20 largest creditors of each Debtor. The Court finds that notice of the Motion, as it relates to this Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules.

14.    <u>Modification of Interim Order</u>. At the Final Hearing, the provisions of this Order with respect to adequate protection may be hereafter modified or continued by the Court as a final order based upon, without limitation, the terms and conditions of a final order determining any lien disputes, or as further determined by the Court at such Final Hearing. The Debtors, the DIP Lender, and the Secured Creditors each reserve the right to seek to modify the terms and conditions of this Order with respect to adequate protection, or otherwise, in connection with the entry of the Final Order.

15.    <u>No Limitation</u>. Nothing contained herein shall be deemed or construed to (i) limit the Debtors, the DIP Lender or the Secured Creditors to the relief granted herein; (ii) bar the Debtors, the DIP Lender or the Secured Creditors from seeking other and further relief for cause shown on appropriate notice to parties-in-interest entitled to notice of same, (provided, however, that any such relief constituting a modification of this Order shall be permitted only to the extent

consistent with the terms of the Final Order (as set forth herein), or (iii) require the Secured

Creditors to make any loans or advances to the Debtors.

IT IS SO ORDERED.

---

THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE.

---

APPROVED FOR ENTRY:

/s/ R. Alex Payne
R. Alex Payne
Gray Waldron
Henry E. ("Ned") Hildebrand IV
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, Tennessee 37212
629.777.6539
alex@dhnashville.com
gray@dhnashville.com
ned@dhnashville.com
*Counsel for Debtor*s